Thomas J. MARZEN, Plaintiff,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., Defendants.

No. 84 C 1225.

United States District Court, N.D. Illinois, E.D.

April 4, 1986.

Clarke D. Forsythe, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., James P. White, Asst. U.S. Atty., Chicago, Ill., Richard M. Friedman, Atty., Dept. of Health and Human Services, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

Plaintiff Thomas J. Marzen, general counsel of the National League Center for the Medically Dependent and Disabled in Indianapolis, Indiana, brought this action under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), seeking to compel the defendants to disclose certain records. The defendants consist of the United States Department of Health and Human Services ("HHS"), the Secretary of HHS, and two subordinate officials of HHS.[1] Specifically at issue are four records from an investigation by the Office for Civil Rights of HHS into possible discrimination against a handicapped individual involving the withholding of medical care from a newborn infant. The investigation involved the "Infant Doe" incident in Bloomington, Indiana, in

---

1. The defendants collectively will be referred to as "the government."

which certain medical treatment was withheld from a Down's syndrome baby with a blocked esophagus who subsequently died. The government refused to release the records citing Exemptions 5, 6, 7(A), and 7(C) of FOIA, 5 U.S.C. §§ 552(b)(5), 552(b)(6), 552(b)(7)(A), and 552(b)(7)(C). In February, 1984, plaintiff filed his complaint for injunctive relief pursuant to 5 U.S.C. §§ 552(a)(3) and 552(a)(4)(B). The government then released some of the requested records, and, on May 12, 1984, filed a *Vaughn* index as required by *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), but continued to withhold four sets of documents under the exemptions cited above. Presently pending before this Court are the parties' cross-motions for summary judgment. In addition, the government seeks dismissal of defendants Sermier and Roberts on the basis that FOIA does not permit suits against subordinate agency officials. The parties agree that there is no material disputed issue of fact which cannot be resolved by the parties' various submissions. The motions are granted in part and denied in part for the reasons stated below.

## FACTS

The baby identified in the documents as Infant Doe was born at 8:10 p.m. on Friday, April 9, 1982, in Bloomington Hospital, Bloomington, Indiana. At birth, the baby was diagnosed as having Down's syndrome and also a defective esophagus. Two doctors recommended surgery to correct the blocked esophagus, but the parents decided against surgery or any other treatment, except sedation as necessary. Everyone involved in the situation recognized that the baby would soon die if the surgery was not performed.

Infant Doe was delivered by Dr. Walter Owens, an obstetrician with privileges at Bloomington Hospital. Dr. Paul Wenzler, a general practitioner who had been the family physician for the parents, was the infant's initial attending physician. Both Dr. Owens and Dr. Wenzler tentatively diagnosed Down's syndrome, and Dr. Wenzler requested a consultation from Dr. James Schaffer, a pediatrician at Bloomington Hospital, who agreed with the Down's syndrome diagnosis and also believed that the infant had tracheoesophageal fistula, a developmental anomaly characterized by an abnormal connection between the trachea and the esophagus resulting in the inability of food and fluids to pass from the mouth to the stomach. Dr. Wenzler and Dr. Schaffer recommended that Infant Doe be transferred immediately to Riley Hospital at the University of Indiana Medical Center, the designated neonatal high risk center, where necessary surgery to correct the tracheoesophageal fistula could be performed. A fourth doctor, Dr. James Laughlin, also a pediatrician on staff at Bloomington Hospital, examined Infant Doe and agreed with the diagnosis already made. He expressly noted, however, "There is clinically no evidence of other congenital anomalies. Further work-up work will be necessary to confirm internal organ defects." He agreed with the recommendation of Dr. Wenzler and Dr. Schaffer that the infant be transferred immediately for surgery to correct the esophageal atresia.

The parents of Infant Doe rejected the recommendation for surgery. At 2:45 p.m. that same day, Saturday, April 10, 1982, the parents signed the following statement by which they approved Dr. Owens' proposed course of action "that the child remain at Bloomington Hospital with full knowledge that surgery to correct tracheoesophageal fistula was not possible at Bloomington Hospital and that within a short period of time the child would succumb due to inability to receive nutriment and/or pneumonia." The infant's medical chart noted that the parents requested that four guidelines be followed in the care of Infant Doe:

"(1) Formula may be given if personnel wish, with full recognition that this will likely cause pneumonia and may speed child's demise.

(2) No IV's.

(3) No antibiotics.

(4) Sedation as necessary if infant appears to be in pain or distress."

The same day, at the instigation of the attorney for Bloomington Hospital, an emergency hearing was held before Judge John G. Baker of the Monroe County Circuit Court. During the hearing, Bloomington Hospital made no representation concerning the appropriate course of treatment which should be followed. Instead, the hospital's position was that it did not have the knowledge or authority to make diagnoses or to prescribe treatment. The hospital asked the Court to issue a declaratory judgment concerning the proper course of treatment for Infant Doe. Dr. Schaffer testified that the surgery on the esophagus was 90% likely to be successful. Dr. Owens testified that he and two other doctors concurred that the recommended course of treatment should be basic techniques "to aid in keeping the child comfortable and free of pain" because "the possibility of a minimally adequate quality of life was non-existent due to the child's severe and irreversible mental retardation." Dr. Laughlin disagreed because "he knew of at least three instances in his practice where a child suffering from Down's Syndrome had a reasonable quality of life," although he knew of no instance of children who had both Down's syndrome and tracheoesophageal fistula. The infant's father testified that he had been a public school teacher for over seven years and on occasion had worked closely with handicapped children and with children with Down's syndrome and that "he and his wife felt that minimally acceptable quality of life was never present for a child suffering from such a condition." He further testified that, after consulting with all four doctors, he and his wife had determined that it was in "the best interest of Infant Doe and the two children at home and their family entity as a whole, that the course of treatment prescribed by Dr. Owens should be followed."

At the conclusion of the hearing, Judge Baker held that the parents, "after having been fully informed of the opinions of two sets of physicians, have the right to choose a medically recommended course of treatment for their child in the present circumstances." In a subsequent letter, apparently to a citizen, Judge Baker elaborated on his rationale, stating:

In the "Infant Doe" case, it could not be said that the parents were not acting in the best interests of the child, even though other parents might have acted differently. It is a harsh view that no life is preferable to life, but the great weight of the medical testimony at the hearing I conducted was that even if the proposed surgery was successful, the possibility of a minimally adequate quality of life was non-existent.

In his written declaratory judgment dated April 12, 1982, Judge Baker also appointed the Monroe County Department of Public Welfare ("MCDPW") as guardian *ad litem* for Infant Doe to determine whether to appeal his judgment.

At 10:00 p.m. that same day, the six-member Child Protection Team of the MCDPW met at Bloomington Hospital to determine whether to appeal Judge Baker's decision. Those also present included the four Bloomington doctors mentioned above, the parents of another Down's syndrome child who testified as to the hardships of raising such a child, and an attorney for Infant Doe's parents, who suggested the presence of additional medical complications, including a heart condition. No minutes or records of this meeting were kept by the MCDPW. After deliberating for approximately one hour, and without reviewing Infant Doe's medical records, the members of the Child Protection Team decided not to appeal Judge Baker's decision, and they filed their report to that effect with Judge Baker on Tuesday, April 13, 1982.

Judge Baker nonetheless immediately appointed on April 13, 1982 Philip C. Hill, a Bloomington attorney, who also represented Dr. Laughlin, as guardian *ad litem* to prosecute an appropriate appeal from his ruling. Mr. Hill filed a petition for a temporary restraining order to provide treat-

ment for Infant Doe, which Judge Baker denied at 10:50 p.m.

That same day, the county prosecutor sought an order from the Monroe County Circuit Court, Juvenile Court Docket that the MCDPW take immediate custody of Infant Doe and provide emergency treatment. This action was taken pursuant to Indiana Code 31-6-4-10, under which a county prosecutor or county department of public welfare may file a petition to declare a child to be "a child in need of services" (referred to as a "CHINS petition"). Under that statute, a "child in need of services" includes a child whose "physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal or neglect of his parent, guardian or custodian to supply the child with necessary food, clothing, shelter, medical care, education or supervision." I.C. 31-6-4-10. Dr. Laughlin and Mr. Hill asked the county prosecutor to file the CHINS petition because the MCDPW had already concluded that the parental decision was not wrongful. The CHINS petition argued that Infant Doe's life was endangered by the refusal of his parents to provide necessary medical care and was supported by affidavits from Drs. Laughlin and Schaffer.

Finally, also on April 13, 1982, Mr. Hill, as guardian *ad litem* for Infant Doe, and the county prosecutor sought an emergency order from the Indiana Supreme Court in the form of a writ of mandamus to the Monroe County Circuit Court to order the treatment of the child.

On Wednesday, April 14, 1982, Judge Spencer denied the county prosecutor's petition for an order declaring Infant Doe to be "a child in need of services" under Indiana law because "the State has failed to show that this child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of his parents to supply the child with necessary food and medical care." Also on that day, the Indiana Supreme Court denied the petition for a writ

of mandamus without issuing a written opinion.

At 10:03 p.m. on April 15, 1982, Infant Doe was pronounced dead by Drs. Schaffer, Laughlin, and Owens while attorneys acting as his guardian *ad litem* were attempting to appeal to the United States Supreme Court. The Indiana Supreme Court sealed all records the next day, April 16, 1982.

The Office for Civil Rights ("OCR") of HHS initiated an investigation, pursuant to its purported responsibility under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, for investigating possible violations of that Act by recipients of federal funds. The investigation focused on Bloomington Hospital and the MCDPW, both of which had received HHS funds. The MCDPW initially resisted cooperation with the investigation, but it eventually supplied the documents that OCR had requested after OCR stressed that the confidentiality of the records would be protected pursuant to OCR regulations, specifically 45 C.F.R. § 80.6(c), and after the Chief Justice of the Indiana Supreme Court had issued an order allowing the MCDPW to turn the documents over to HHS and ordering HHS to keep them confidential.

The investigation was conducted by an investigator in OCR's Regional Office in Chicago. He prepared a draft report on the investigation and, in accordance with OCR practice, sent it to OCR headquarters. The draft report included excerpts from the medical records that were not quoted in records already made available to the public. This draft report is one of the records at issue in this case. Later, a final draft was prepared which ultimately was produced pursuant to the plaintiff's FOIA request.

OCR's investigation of the Infant Doe incident was completed without a recommendation for the initiation of enforcement proceedings under the Rehabilitation Act. The investigation centered on Bloomington Hospital and MCDPW as recipients of federal funds. The Bloomington Hospital took the position that "it did everything within

its power to obtain authority to see that surgery was provided." The MCDPW took the position that, because the Indiana courts decided that Infant Doe was not a "child in need of services" under Indiana law, that determination was dispositive. Therefore, the MCDPW could not be shown to have withheld discriminatorily child protective services from a "qualified" handicapped individual.

Since April, 1982, two developments have occurred which affect the issue of whether the MCDPW achieved voluntary compliance with the Rehabilitation Act.[2] First, the Indiana legislature amended its child abuse and neglect law to add to Indiana Code 31–6–4–3 the following:

> A child in need of services includes a handicapped child who is deprived of nutrition that is necessary to sustain life, or who is deprived of medical or surgical intervention that is necessary to remedy or ameliorate a life-threatening medical condition, if the nutrition or medical or surgical intervention is generally provided to a similarly situated handicapped or nonhandicapped child.

Second, the Indiana Department of Public Welfare adopted procedures and methods of administration in compliance with 45 C.F.R. § 84.55(c), a regulation designed to assure that county public welfare departments use their statutory authority to prevent instances of medical neglect of handicapped infants. These newly adopted procedures incorporated the state statutory amendment and all of the elements specified in 45 C.F.R. § 84.55(c). Because the Director of the MCDPW assured OCR that the MCDPW was functioning in accordance with the new procedures, OCR's investigation ended without an immediate recommendation for further action.

The FOIA request that led to this suit essentially sought all records in OCR's possession relating to the Infant Doe incident. Plaintiff is counsel to the guardian *ad li-*

*tem* of Infant Doe and was formerly Chief Staff Counsel of the Americans United for Life Legal Defense Fund, a public interest law firm providing legal services for "human beings at all stages of biological development, regardless of age or condition of dependency." (Affidavit of Thomas J. Marzen, ¶ 1.) Plaintiff filed this action in that capacity, and he acknowledges in his affidavit that, as counsel to the guardian of Infant Doe, he was aware of all the information he requested from HHS except for Infant Doe's medical records, which were not a part of the original court records but which were sealed by the Indiana Supreme Court at the parents' request after Infant Doe's death. (Marzen Affidavit, ¶ 3.) Plaintiff declares that, although he was privy to the documents he requested except for the medical records, he considers himself bound by the order of the Indiana Supreme Court not to disclose the documents he secured as counsel to the guardian of Infant Doe. (Marzen Affidavit, ¶ 5.) He seeks disclosure of the documents for public inspection. He also wishes to be able to participate in the debate on a case of "great public interest" which "has generated significant journalistic commentary, wide public concern, and political consequences of the highest order." (Marzen Affidavit, ¶¶ 8, 9.) Plaintiff concludes his affidavit by stating:

> 11. Because of the clear public interest to be served by disclosure of the requested documents and because the Indiana judiciary steadfastly refused to allow them to be released, I decided to seek these documents from the Department of Health and Human Services under the Freedom of Information Act after it became apparent that the Department would take no action against Bloomington Hospital or any other individual or entity involved in the decision-making process leading to Infant Doe's death. Secured in this fashion, the documents would not be subject to the same

---

**2.** Under Section 602 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1, made applicable to Section 504 compliance activities by Section 505(a)(2) of the Rehabilitation Act, no action by HHS to effect compliance may be taken until HHS determines "that compliance cannot be secured by voluntary means."

legal and ethical constraints that adhere to the documents I secured and inspected as counsel to the guardian of Infant Doe. Should I secure them from the Department I would submit them to interested publishers and researchers so that they could become matters of public record, analysis, and commentary.

12. My sole purpose in pursuing this action is to expose the legal process and medical circumstances that attended the death of Infant Doe to public scrutiny. I have no interest in exposing the identity of either the parents of Infant Doe or of Infant Doe. As an attorney and as a private citizen, I am motivated by a firm belief in the policy that underlies both the Freedom of Information Act and the First Amendment to the United States Constitution favoring full public disclosure of and debate on all matters of public import, such as the circumstances that attended judicial sanction of the death of Infant Doe.

(Marzen Affidavit, ¶¶ 11, 12.)

Access to all records requested by plaintiff and located by OCR was initially denied, partly because the investigation was still open and disclosure could interfere with that investigation. Plaintiff's administrative appeal was denied for the same reason. After that appeal was denied, the investigative phase of the OCR proceeding was closed, and HHS released a number of documents to plaintiff, primarily correspondence between OCR and the state agencies, pleadings filed with and papers issued by the state courts, and the final version of the OCR Investigative Report, which explains the issues in the investigation and contains facts relevant to those issues.

At this stage, the government continues to withhold only four sets of records: document 1 is the medical records of the Infant Doe incident from Bloomington Hospital; document 2 is the report to the Monroe County Circuit Court from the Director of the MCDPW; document 3 is a roster of the members of the Child Protection Team; and document 4 is the draft of the Investigative Report.

## DISCUSSION

FOIA was designed to expose both the processes of government and governmental records to public scrutiny unless the requested records are exempt under nine "clearly delineated statutory exemptions." *Department of Air Force v. Rose*, 425 U.S. 352, 360–61, 96 S.Ct. 1592, 1598–99, 48 L.Ed.2d 11 (1976). The exemptions claimed here by the government for each category of documents are Exemptions 5, 6, 7(A), and 7(C).

First, the government claims that documents 1–3 are non-disclosable under Exemption 7(A) which protects "investigatory records compiled for law enforcement purposes" to the extent that disclosure would "interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The government contends that failure to preserve the confidentiality of investigatory records would make it much more difficult, if not impossible, to obtain such documents quickly in future investigations. Indeed, it was only on the promise of guaranteed confidentiality, to the extent allowed by law, that the government obtained the records in this case.

Second, the government claims that the Infant Doe medical records (and the portions of those records excerpted in the draft Investigative Report) are protected by Exemptions 6 and 7(C) of FOIA. Exemption 6 protects records "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects law enforcement investigatory records to the extent that disclosure would "constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). The government contends that because the medical records contain the intimate details of Infant Doe's condition and of the parents' responses and conduct throughout the six day period of the baby's life, disclosure of those records would constitute a clearly unwarranted invasion of the parents' privacy while serving no public interest. Similarly, the government claims that disclos-

ing the Child Protection Team membership roster and that portion of document 2 that lists the names of members of the Team would invade the team members' privacy unnecessarily and could result in harassment of those individuals.

Finally, the government contends that the draft investigatory report is protected by the evidentiary privilege for memoranda that are part of the government's deliberative process and by Exemption 5 of FOIA which protects "intra-agency memorandums ... which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). *See also United States v. Weber Aircraft Corp.,* 465 U.S. 792, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984); *Federal Trade Commission v. Grolier, Inc.,* 462 U.S. 19, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983).

Plaintiff responds first by emphasizing the enormous degree of public interest spawned by the Bloomington Infant Doe case which must be balanced against the various privacy interests involved under Exemptions 6 and 7(C) of the FOIA. As proof of the extent of public interest, plaintiff contends that the Chicago Tribune considered this Infant Doe case as the primary catalyst for the "Infant Doe regulations" and for the Child Abuse Amendments of 1984. *See, e.g., Chicago Tribune,* Oct. 10, 1984, sec. 1, p. 4; Dec. 8, 1984, sec. 1, p. 10. The case has also spawned a host of legal commentary. *See, e.g.,* Shapiro, *Medical Treatment of Defective Newborns: An Answer to the "Baby Doe" Dilemma,* 20 Harv.J. on Legis. 137 (1983); Comment, *Defective Newborns: Inconsistent Application of Legal Principles Emphasized By the Infant Doe Case,* 14 Tex.Tech.L. Rev. 569 (1983); Comment, *The Legacy of Infant Doe,* 34 Baylor L.Rev. 699 (1982).

Plaintiff identifies two components of the public interest in support of disclosure: (1) the lawful disclosure of the complete facts surrounding the birth, care, and death of Infant Doe to stimulate public debate based on accurate information; and (2) the examination of the records as a means of overseeing and evaluating the mandate of OCR to investigate "Infant Doe" incidents under Section 504 of the Rehabilitation Act of 1973 and the similar mandate of Indiana officials to investigate such incidents under Indiana law.

As to the first component, plaintiff stresses that to date, reports of the Infant Doe incident have been neither complete nor accurate. Because the First Amendment contains "the antecedent assumption that valuable public debate—as well as other civic behavior—must be informed," *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 587, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (J. Brennan, concurring), plaintiff contends that the fundamental value of First Amendment principles is shattered when the true facts are suppressed and the facts assumed are inaccurate. Plaintiff and others who have submitted affidavits in support of the plaintiff's motion for summary judgment recognize that the identities of Infant Doe and his parents "are wholly irrelevant to the larger concern that the rights of handicapped newborns be protected" (Plaintiff's Brief at 7) and seek disclosure of the records with all references to the identities of the Does deleted. Plaintiff and the other affiants represent public interest groups who are vitally concerned with the rights of handicapped persons, and they believe that the disclosure of accurate information will help them to demonstrate their view that "intentional starvation is an arbitrary and capricious course of action, which should never be undertaken with regard to Down's Syndrome newborns." (Plaintiff's Brief at 7.)

As to the second component of the public interest identified above, plaintiff stresses that it is crucial for an accurately informed electorate to maintain accountability over state and federal public officials. Indeed, "the people's right to know what their government is doing" was the basis upon which FOIA was enacted, as its legislative

history repeatedly indicates.[3] This interest includes even salary and other information concerning public employees, *Aug v. National Railroad Passenger Corp.*, 425 F.Supp. 946, 951 (D.D.C.1976), and extends to state and local government employees as well as to employees of the federal government. The media have questioned the government's handling of the Infant Doe incident and others like it, and plaintiff asserts that access to the requested records will permit the public to better assess the validity of these accusations and evaluate whether the government conducted the investigation properly. As a corollary, knowledge of the identities of the members of the Child Protection Team is essential to the rights of citizens to hold their elected and appointed officials accountable: "Secret Star Chambers are not accountable to the people." (Plaintiff's Brief at 9.)

FOIA expressly provides that when a governmental agency refuses to disclose records so that the party who requested the records must file suit to obtain them, "the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B). "To meet this burden and to assist the court in making its determination, the agency must provide detailed justification for its claim of exemption, addressing the requested documents specifically and in a manner allowing for adequate adversary testing." *Antonelli v. Drug Enforcement Administration*, 739 F.2d 302, 303 (7th Cir.1984). It normally does this through the submission of a *Vaughn* index. *Vaughn v. Rosen*, 484 F.2d at 823.

■ The nine statutory exemptions are exclusive, narrowly construed, and limited so as not to "obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Department of the*

*Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976); *see also Federal Bureau of Investigation v. Abramson*, 456 U.S. 615, 630, 102 S.Ct. 2054, 2063, 72 L.Ed.2d 376 (1982); *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 220–21, 98 S.Ct. 2311, 2316, 57 L.Ed.2d 159 (1978). Reflecting this policy, the FOIA exemptions are permissive and not mandatory in the sense that FOIA permits exemption but does not require it. *General Dynamics Corp. v. Marshall*, 572 F.2d 1211, 1216 (8th Cir.1978), *vacated on other grounds*, 441 U.S. 919, 99 S.Ct. 2024, 60 L.Ed.2d 392 (1979). Moreover, FOIA specifically provides that "any reasonably segregable portion of a record shall be provided ... after deletion of the portions which are exempt under this subsection [b]." 5 U.S.C. § 552(b). Finally, although other *statutes* may exempt specific information from disclosure under FOIA, no agency regulation can circumvent FOIA by prohibiting disclosure of information otherwise required to be disclosed under FOIA. *Washington Research Project, Inc. v. Department of Health, Education and Welfare*, 504 F.2d 238, 253 (D.C.Cir.1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975). *See also Mobil Oil Corp. v. Federal Trade Commission*, 406 F.Supp. 305, 310 (S.D.N.Y.1976), *Burroughs Corp. v. Schlesinger*, 403 F.Supp. 633, 637 (E.D.Va.1975). Indeed, the legislative history of FOIA indicates that no agency has the "statutory authority to extend blanket exemption, let alone to solicit the exemptions of confidentiality." *1975 Source Book, supra* note 3, at 23.

■ Although the parties' briefs in this case focus on whether the various exemptions to FOIA may be applied to preclude disclosure, a more fundamental issue must be addressed first: whether the requested

---

**3.** *See House Committee on Government Operations and Senate Committee on the Judiciary, Freedom of Information Act and Amendments of 1974 (P.L. 93–502) Source Book,* 94th Cong., 1st Sess. 99 (Statement of Rep. Moorhead) (Joint Committee Print 1975) *("1975 Source Book"). See also id.* at 236 (Statement of Rep. Natsunaga), 262 (Statement of Rep. Gude), 267, 268

(Statement of Rep. Patten), 269 (Statement of Rep. Broomfield), 271 (Statement of Rep. Reuss), 272 (Statement of Rep. Harrington), 300 (Statement of Sen. Cranston), 311 (Statement of Sen. Javits), 417 (Statement of Rep. Conte), 425 (Statement of Rep. Tiernan), 457 (Statements of Sen. Hruska and Taft), 461 (Statement of Sen. Ervin), and 471 (Statement of Sen. Metcalf).

records are "agency records" within the meaning of FOIA. FOIA empowers federal courts to order an agency to produce "agency records improperly withheld" from an individual requesting access. 5 U.S.C. § 552(a)(4)(B).

The agency whose "records" are at issue in this case is the Office for Civil Rights of the Department of Health and Human Services. According to the government, OCR has the responsibility to investigate possible acts of discrimination against those who are handicapped in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.[4] HHS has promulgated regulations implementing Section 504 at 45 C.F.R. § 84. Under 45 C.F.R. § 84.61, the procedures set forth at 45 C.F.R. §§ 80.6 through 80.10, and at 45 C.F.R. § 81, apply to investigations of potential violations of Section 504. According to the government, 45 C.F.R. § 80.7(c) authorizes HHS to investigate potential violations of Section 504, and 45 C.F.R. § 80.6(c) requires recipients of HHS funds to provide the government access to information in connection with the compliance investigation. OCR conducted this Infant Doe investigation purportedly pursuant to the authority vested in it under Section 504 as implemented through these regulations.

The Second Circuit has held, however, that HHS lacked statutory authority to conduct "Infant Doe" type investigations and to compel the production of medical records under Section 504 of the Rehabilitation Act of 1973. *United States v. University Hospital, State University of New York at Stony Brook,* 729 F.2d 144 (2d Cir.1984); *American Hospital Ass'n v. Heckler,* 585 F.Supp. 541 (S.D.N.Y.1984), *aff'd,* 794 F.2d 676 (2d Cir.1984), *cert. granted,* — U.S. —, 105 S.Ct. 3475, 87 L.Ed.2d 611 (1985).[5] If the Second Circuit's position

is affirmed in pertinent part by the Supreme Court, the primary crucial question in this case becomes: are records which were obtained by a governmental agency, purportedly under statutory authority for investigation and compliance purposes, which authority was later declared to be non-existent, nonetheless "agency records" within the scope of FOIA that must be disclosed unless an exemption applies?

Despite this Court's specific request that the parties address this question in supplemental briefs, neither party has done so adequately. The government's supplemental brief does not discuss the issue at all, and the plaintiff addresses it only with arguments which are either irrelevant, superficial, or border on the frivolous.

Plaintiff argues first that OCR did not obtain these Infant Doe records under the regulations struck down in *American Hospital Ass'n* or in *University Hospital,* but under Section 504's procedural regulations that have never been questioned. This argument is so disingenuous that it bears quoting in full:

In *AHA v. Heckler,* 585 F.Supp. 541 (S.D.N.Y.1984), the plaintiffs challenged the *"final regulations"* promulgated by the Department of Health and Human Services (HHS) ("45 C.F.R. § 84.55(b)–(e), 49 Fed.Reg. 1622, et seq....") *Id.* at 542 (Infant Doe regulations). The proposed rules were published on July 5, 1983 at 48 Fed.Reg. 30846.

In contrast, HHS first requested access to the Infant Doe records by letter of December 22, 1982 and again by letter of April 1, 1983. *See* Exhibit C *infra* (Letter of April 1, 1983 from Betty Lou Dotson, Director, Office of Civil Rights to Mr. James R. Cummings, Director, Monroe County Department of Public

**4.** Section 504 provides:
No otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

29 U.S.C. § 794.

**5.** When the Supreme Court issues its opinion in the *American Hospital Ass'n* case, it will be issued under the name *Bowen v. American Hospital Ass'n* because of the appointment of a new Secretary of HHS.

Welfare). The April 1 letter demanded compliance with § 504 pursuant to "45 C.F.R. § 80.6(c), made applicable to 45 C.F.R. Part 84 by 45 C.F.R. § 84.61." *Id.* at 2. 45 C.F.R. 84.61ff are the regulations which incorporated the procedural regulations of Title VI for purposes of § 504. The validity of 45 C.F.R. § 84.61ff has never been contested; to the contrary, it is quite clear that they are valid, since 504 was patterned after Title VI. *Alexander v. Choate* [469 U.S. 287], 105 S.Ct. 712, 716–17 n. 7, 718, n. 13, 722, n. 24 [83 L.Ed.2d 661] (1985), *Consolidated Rail Corp. v. Darrone*, [465 U.S. 624] 104 S.Ct. 1248, 1254–55 n. 16 [79 L.Ed.2d 568] (1984). In *Darrone*, the Supreme Court held "that [the] 1978 Amendments to the [Rehabilitation] Act were intended to codify the regulations enforcing 504." *Alexander*, 105 S.Ct. at 722–23 n. 24. And, the regulations existing at the time of the 1978 amendments included 45 C.F.R. § 84.61. 42 Fed.Reg. 22677 (1977), 42 Fed.Reg. 22888 (1977).

Thus, these records were obtained by HHS under procedural regulations which incorporated the procedures of Title VI, not under the Infant Doe regulations enjoined in *AHA*. Accordingly, even if the Supreme Court affirmed the decision in *AHA*, striking the Infant Doe regulations, the decision will have no effect on the records in this case.

(Plaintiff's Supplemental Brief at 3–4; emphasis in original; footnote omitted.)

The obvious problem with this argument is that it completely misses the point.[6] The point underlying the Second Circuit's decisions in *American Hospital Ass'n* and in *University Hospital* is that HHS lacks statutory authority to conduct investigations of Infant Doe-type incidents under Section 504 and to require compliance therewith. The particular, specific regulations under which HHS believed it had the authority to conduct such investigations, gather documents, and require compliance are wholly irrelevant to the issue of whether Congress intended to grant that authority under Section 504 in the first place. The Second Circuit squarely held that Congress did not. Thus, the Supreme Court cases plaintiff cites to support his argument that the regulations which incorporated the procedural regulations of Title VI for purposes of Section 504 have been upheld are irrelevant to whether HHS properly applied those procedural regulations to investigations within its authority under Section 504. Because the Second Circuit has held that HHS had no such authority, the form of the Infant Doe regulations, procedural or otherwise, does not matter. Indeed, plaintiff so conceded during oral argument requested by this Court specifically on this question:

> Now, your Honor, I concede that if the Supreme Court in *Bowen vs. American Hospital Association* was to broadly hold that Section 504 does not in any way apply to the medical treatment of handicapped newborns, then they could not obtain the records under Title [VI] procedural regulations or under the Infant Doe regulations, especially in the future.

> \* \* \* \* \* \*

> If there was [a] broad holding in the *Bowen* case, by the Supreme Court upholding the Second Circuit Court of Appeals, that 504 does not in any respect apply to the handicapped infants, then, yes, it would be invalid for the Department to obtain records under the Infant Doe regulations or under the Title [VI] procedural regulations.

(Transcript of Oral Argument, Feb. 3, 1986, at 4–5, 7.)

Second, plaintiff contends that the Second Circuit's decisions can have no legal effect on this case because the injunction

---

**6.** This Court found this argument to be so incredible on its face that, to give plaintiff the benefit of the doubt, the Court requested oral argument specifically on this issue so that plaintiff could explain what he meant, if in fact he meant something other than what he states, and asked plaintiff to provide the Court with copies of the regulations to which he refers. Unfortunately, it soon became apparent at the oral argument that the Court had not misunderstood the import of plaintiff's argument as presented in his supplemental brief.

entered in *American Hospital Ass'n*, by which Judge Brieant declared that actions to regulate treatment in *"currently pending* investigations and other enforcement actions are declared invalid and unlawful," did not enjoin either the investigation OCR undertook in this case, which is completed, or any enforcement proceeding relating to these Infant Doe records, which apparently is not contemplated. This argument is a red herring: no one has suggested that this Court would be violating Judge Breiant's injunction by ordering production of the requested records in this case.

Finally, the plaintiff argues that the Second Circuit's decisions can have no legal effect on this case because the validity of the Infant Doe regulations does not affect the status of these records as "agency records" under FOIA. Plaintiff contends that the term "agency records" under FOIA is construed by courts to mean records within the possession, custody, or control of the agency. *See, e.g., Kissinger v. Reporters Committee For Freedom of the Press*, 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980). Because there is no question that these records are in the possession, custody, and control of OCR, plaintiff contends they are "agency records" within the meaning of FOIA. The government does not dispute this contention; surprisingly enough, the government agrees with plaintiff. (Transcript of Oral Argument, Feb. 3, 1986, at 12.)

This Court cannot agree. The Court finds the notion that every member of the public may have access to otherwise unobtainable records through the vehicle of a FOIA request to a governmental agency that had no legal authority to obtain the records in the first place to be abhorrent.

Plaintiff admits that he has been unable to locate any case addressing whether records obtained by an agency under regulations later declared invalid are "agency records" subject to disclosure under FOIA.[7] This Court too has not located such a case. But the plaintiff leaps to the conclusion, without analysis, that the only relevant considerations are whether the records are in the "possession, control, or custody" of the agency. (Plaintiff's Supplemental Brief at 9–10.) The mere fact that no court has either been confronted with or focused upon the question before; however, is no excuse to evade careful analysis when the facts mandate that the question be reached.

Because this issue apparently is one of first impression, this Court recognizes that it must proceed carefully. FOIA itself does not define the phrase "agency records," and the legislative history does not provide meaningful assistance on what sort of materials Congress intended FOIA to encompass. *See, e.g., Kissinger*, 445 U.S. at 151, 100 S.Ct. at 968; *Forsham v. Harris*, 445 U.S. 169, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980); *McGehee v. C.I.A.*, 697 F.2d 1095, 1106 (D.C.Cir.1983), *modified on other grounds*, 711 F.2d 1076 (D.C.Cir. 1983). Consequently, plaintiff is correct when he asserts that courts have generally focused on whether the record is in the "possession, control, or custody" of the agency.[8]

---

7. Apparently, the government has not even attempted to find such a case.

8. *See generally, Forsham v. Harris*, 445 U.S. 169, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980); *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980); *General Electric v. United States Nuclear Regulatory Comm'n*, 750 F.2d 1394 (7th Cir. 1984); *Bureau of National Affairs, Inc. v. United States Department of Justice*, 742 F.2d 1484 (D.C. Cir.1984); *Berry v. Department of Justice*, 733 F.2d 1343 (9th Cir.1984); *International Brotherhood v. National Mediation Board*, 712 F.2d 1495 (D.C.Cir.1983); *Crooker v. United States Parole Comm'n*, 730 F.2d 1 (1st Cir.1984); *Wolfe*

*v. Department of Health and Human Services*, 711 F.2d 1077 (D.C.Cir.1983); *McGehee v. C.I.A.*, 697 F.2d 1095 (D.C.Cir.1983), *modified on other grounds*, 711 F.2d 1076 (D.C.Cir.1983); *Carson v. United States Department of Justice*, 631 F.2d 1008 (D.C.Cir.1980); *Ryan v. Department of Justice*, 617 F.2d 781 (D.C.Cir.1980); *Goland v. C.I.A.*, 607 F.2d 339 (D.C.Cir.1978), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *Lacy v. United States Department of Navy*, 593 F.Supp. 71 (D.Md.1984); *Tigar & Buffone v. Department of Justice*, 590 F.Supp. 1012 (D.D.C.1984); *Center for National Security Studies v. C.I.A.*, 577 F.Supp. 584 (D.D.C.1983); *Illinois Institute for Continuing Legal Education v.*

In *Kissinger,* the Supreme Court held that if a document has been transferred to, and is in the possession of, a nonagency, an agency has no affirmative duty to institute a retrieval action when the documents are requested under FOIA, and the agency does not "improperly withhold" the records by refusing to institute such a retrieval action. 445 U.S. at 139, 100 S.Ct. at 963. Noting expressly that "agency possession or control is prerequisite to triggering any duties under the FOIA," *id.* at 151, 100 S.Ct. at 968, the Court held that the mere physical location of records does not convert them into agency records if they were not controlled, generated, or used by the agency for any purpose. *Id.* at 157, 100 S.Ct. at 972. Similarly, in *Forsham v. Harris,* 445 U.S. 169, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980), the Court held that written data which have not been "obtained" by a federal agency, but are generated, owned, and possessed by a privately controlled organization receiving federal study grants, are not "agency records." *Id.* at 171, 100 S.Ct. at 980.[9] Thus, "neither an agency's access to documents (that is, its unexercised power to obtain them) nor even the agency's physical custody of documents (not created by the agency) is enough, in and of itself, to turn documents into agency records." *General Electric Co. v. United States Nu-*

clear Regulatory Commission, 750 F.2d 1394, 1400 (7th Cir.1984).

No federal case directly holds that before records may be considered "agency records" subject to disclosure under FOIA, they must have been obtained pursuant to the agency's legal authority to access to those records. Nonetheless, there is language in Supreme Court cases that suggests the converse: i.e., that a federal right of access to records in and of itself does not necessarily render the records "agency records" under FOIA. *See, e.g., Forsham, supra,* 445 U.S. at 171, 185–86, 100 S.Ct. at 980, 986–87.[10]

The *Forsham* case, and every other case cited by the parties, rests on the implicit assumption that the records obtained by the agencies in those cases were obtained pursuant to legal authority to do so. Indeed, this assumption is implicit in FOIA itself because Congress could not have intended to expose to public scrutiny documents that the agency itself had no legal authority to examine.

Congress set forth this assumption expressly in the Privacy Act, 5 U.S.C. § 552a(e)(1):

> (e) *Agency requirements.*—Each agency that maintains a system of records shall—

---

United States Department of Labor, 545 F.Supp. 1229 (N.D.Ill.1982); *Iglesias v. C.I.A.,* 525 F.Supp. 547 (D.D.C.1981); *Valenti v. United States Department of Justice,* 503 F.Supp. 230 (E.D.La.1980); *Ciba-Geigy Corp. v. Mathews,* 428 F.Supp. 523 (S.D.N.Y.1977).

9. The "possession, control, or custody" test essentially relies upon how extensively the government uses the records. Although mere physical location at the agency is not enough to create an "agency record," *Forsham,* 445 U.S. at 185, 100 S.Ct. at 986, "only limited use" *is* sufficient. *General Electric Co.,* 750 F.2d at 1400. One time, "transitory possession" is not enough, *International Brotherhood,* 712 F.2d at 1496, but use of the record in the performance of the agency's business is enough. *Ciba-Geigy Corp.,* 428 F.Supp. at 529. The record must in fact be obtained by the agency; the opportunity to obtain it is not enough. *Forsham,* 445 U.S. at 186, 100 S.Ct. at 987; *Wolfe v. Department of Health and Human Services,* 711 F.2d at 1079 n. 7.

10. The Court stated in *Forsham:*

Petitioners place great reliance on the fact that HEW has a right of access to the data, and a right if it so chooses to obtain permanent custody of the UGDP records. 45 CFR §§ 74.24, 74.21 (1979). But in this context the FOIA applies to records which have been *in fact* obtained, and not to records which merely *could have been* obtained. To construe the FOIA to embrace the latter class of documents would be to extend the reach of the Act beyond what we believe Congress intended. We rejected a similar argument in *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 161–62, 95 S.Ct. 1504, 1521–22, 44 L.Ed.2d 29 (1975), by holding that the FOIA imposes no duty on the agency to create records. By ordering HEW to exercise its right of access, we effectively would be compelling the agency to "create" an agency record since prior to that exercise the record was not a record of the agency. Thus without first establishing that the agency has created or obtained the document, reliance or use is similarly irrelevant.

445 U.S. at 185–86, 100 S.Ct. at 986–87 (emphasis in original) (footnote omitted).

(1) maintain in its records only such information about an individual as is relevant and necessary to accomplish a purpose of the agency *required to be accomplished by statute* or by executive order of the President....

(Emphasis supplied.) *See also Clarkson v. Internal Revenue Service*, 678 F.2d 1368, 1377 (11th Cir.1982) (Subsection (e)(1) "provides a general overall prohibition against the collection and maintenance of information which is irrelevant to the purposes of an agency.") [11]

This Court hesitates to vest great weight on the Privacy Act both because it was passed subsequent to FOIA and because those statutes were informed by different congressional concerns. At bottom, FOIA is a disclosure statute, whereas the "purpose of the [Privacy Act] is to provide certain safeguards for an individual against an invasion of personal privacy by [establishing certain requirements for] Federal agencies...." Privacy Act of 1974, Pub.L. No. 93–579 § 2(b) (1974); [12] *Privacy Act Source Book* at 501.[13] However, the Privacy Act was enacted only 40 days after Congress had overridden President Ford's veto of the 1974 FOIA amendments. Because of the absence of either a statutory definition of, or of legislative history on,

the term "agency records" in FOIA, and because Congress considered and passed both the 1974 FOIA amendments and the Privacy Act virtually simultaneously, no better evidence than the Privacy Act and its legislative history exists that Congress did not intend agencies to maintain records and divulge them to the public unless authorized to do so by statute.

The legislative history of Section 552a(e)(1) the Privacy Act demonstrates conclusively that Congress deemed the agency's statutory authorization to collect and maintain records about an individual to be so important as to be of constitutional magnitude. The Senate Report on the Senate version of the statute that ultimately was enacted as Section 552a(e)(1) states:

*Subsection 201(a)(1)*. Provides that each Federal agency shall collect, solicit and maintain only such personal information as is relevant and necessary to accomplish a statutory purpose of the agency.

This section, therefore, governs the first phase of the process which is the gathering of the information in the first place. The provision reaffirms the basic principles of good management and public administration by assuring that the kinds of information about people which an agency seeks to gather or solicit and

---

**11.** Congress elaborated further in its Congressional Findings and Statement of purpose:

(b) The purpose of this Act [enacting this section and notes set out under this section] is to provide certain safeguards for an individual against an invasion of personal privacy by requiring Federal agencies, except as otherwise provided by law, to—

(4) collect, maintain, use, or disseminate any record of identifiable personal information in a manner that assures that such action is for a necessary and lawful purpose, that the information is current and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information....

Pub.L. 93–579 § 2.

**12.** For example, information must be gathered directly from individuals to the greatest extent practicable when it may result in determinations which adversely affect their rights, benefits, or privileges under federal programs (5 U.S.C. § 552a(e)(2)); individuals from whom information is sought must be informed concerning the agency's authority to request the

data as well as the purpose for which it will be used (5 U.S.C. § 552a(e)(3)); records about individuals must be maintained with appropriate accuracy, relevance, timeliness, and completeness (5 U.S.C. § 552a(e)(5)); reasonable efforts must be taken to assure the accuracy of records about individuals before they are disseminated (5 U.S.C. § 552a(e)(6)); records about how individuals exercise their First Amendment rights cannot be maintained unless they are expressly authorized by statute or by the individual in question (5 U.S.C. § 552a(e)(7)); and rules of conduct must be established for agency officials responsible for maintaining records about individuals (5 U.S.C. § 552a(e)(9)).

**13.** The legislative history of the Privacy Act is compiled in Joint Committee Print, *Legislative History Of The Privacy Act Of 1974, Source Book on Privacy*, Senate Comm. on Gov't Operations and House Comm. on Gov't Operations, 94th Cong., 2d Sess. (1976) ("*Privacy Act Source Book*").

the criteria in programs for investigating people are judged by an official at the highest level to be relevant to the needs of the agency as dictated by statute. Second, it requires a decision that the collection of information or investigation of people along certain information lines is necessary in that the needs of the agency and goals of the program cannot reasonably be met through alternative means.

\* \* . \* \* \* \*

*This section is designed to assure observance of basic principles of privacy and due process* by requiring that where an agency delves into an area of personal privacy in the course of meeting government's needs, its actions may not be arbitrary, but rather, must be authorized, and found to be not only reasonable, but warranted by the overriding needs of society as the agency is responsible for administering to those needs.

S.Rep. No. 93–1183, 93rd Cong., 2d Sess. 46–47 (1974) U.S.Code Cong. & Admin. News 1974, pp. 6916, 6961–6962, *Privacy Act Source Book, supra,* at 199–200 (emphasis supplied). This Court cannot condone a construction of the term "agency records" in FOIA that flies in the face of Congress's mandate in the Privacy Act "to assure observance of basic principles of privacy and due process" by requiring that agency record collection and maintenance be authorized "by statute or by executive order of the President." 5 U.S.C. § 552a(e)(1).

In response, plaintiff first points to the obvious: FOIA's exemptions are "explicitly made exclusive." *Environmental. Protection Agency v. Mink,* 410 U.S. 73, 79, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973). That response begs the question. If a record is not an "agency record" within the scope of FOIA in the first instance, the question of whether it also falls within the nine, narrowly construed statutory exemptions never arises. Without citation to any authority, plaintiff contends secondly:

> How the agency obtains the records is immaterial. Indeed, if the CIA or any other agency notoriously *stole* records, it is inconceivable that they would not be subject to FOIA *merely* for that reason. Unless one of the nine exemptions applied, the public interest in disclosure might be even greater. Certainly, the interest of the public in "knowing what their government is doing" would be just as high. This is why withholding has been limited to the nine exemptions.

(Plaintiff's Supplemental Brief at 7.)[14]

■ Certainly, one of the purposes of FOIA is the underlying public interest in knowing what the government is doing. But that interest is served in and of itself by the *Vaughn* index which the government must prepare under *Vaughn v. Rosen, supra,* whenever it decides not to disclose documents under FOIA. The government must describe the document generally and list the reason for nondisclosure in the *Vaughn* index. At the oral argument held before this Court on February 3, 1986, neither the government nor plaintiff could adequately explain why they believed that the public's interest in knowing how its government works is not protected satisfactorily by the government's admission in a *Vaughn* index that the documents are not disclosable because they were obtained without authority or illegally. (Transcript of Oral Argument, Feb. 3, 1986, at 35–43.)

The very example cited by the plaintiff illustrates the logic of the conclusion that the *Vaughn* index does in fact satisfy the public's interest in knowing what the government is doing. If a governmental agency obtains records illegally, for example through theft, the public need know only that fact and the general nature and extent of the records stolen. The content of those records is not necessarily subject to public disclosure. An immediate illus-

---

**14.** Plaintiff does cite to two cases in support of his statement that "courts have determined that, generally, it does not matter how the agency acquired the record": *Petkas v. Staats,* 501 F.2d 887, 889 (D.C.Cir.1974); *United States v. Trucking Employees, Inc.,* 39 Ad.L.2d (Pike & Fischer) 694, 696 (D.D.C.1976). Neither case supports that statement.

tration comes to mind. During the Watergate era, members of the "Plumbers" unit broke into the office of Daniel Ellsberg's psychiatrist and stole his file on Ellsberg. Surely, Ellsberg's psychiatric file, subsequently in the possession, custody, and control of the government, could not be disclosed to every member of the public merely because of those circumstances.[15] The manner in which those records were obtained clearly is relevant to whether they properly were "agency records." The public's interest in knowing how its government works is satisfied to the extent necessary by the government's admission in a *Vaughn* index that the documents were obtained only because they were stolen, an admission which no governmental agency would make lightly and which, by its very serious nature, suggests its truth.

Of course, this conclusion applies only to documents which were generated elsewhere and which the federal governmental agency in question obtained without legal authority. It does not apply to documents which the governmental agency itself generates during the course of carrying out its functions. This case is illustrative. Documents 1, 2, and 3 originated at the Bloomington Hospital (i.e. Infant Doe's medical records) or at the MCDPW (i.e., the report to the Monroe County Circuit Court from the Director of the MCDPW and the roster of the members of the Child Protection Team). Only document 4, the OCR's draft of the Investigative Report, was generated by OCR itself. Although the public has a clearly protected governmental oversight interest in having access to reports generated by governmental agencies during the course of an investigation, the plaintiff has given no reason why the public should have access to records that otherwise would be barred to it merely because the federal government has undertaken an unautho-

rized and illegal course of action to obtain those records.

When asked at oral argument why the public should now have access through a FOIA request to medical records of Infant Doe that are normally kept strictly confidential and why a *Vaughn* index disclosing that the records were obtained illegally would not suffice, plaintiff's response was:

> Because, number one, the interest of the public is the information in the records, not whether the Government believes that it has them illegally or legally. The public information is what is in the record.
>
> And, secondly, FOIA was enacted so that Governmental explanations about what it's doing isn't the final answer. FOIA was enacted so that the public gets beyond what the Government says about what it is doing. And if the Government in a Vaughn Index was to say, well, we received these illegally, or it's not in the public's interest to know about this, FOIA is enacted for the public to get behind those statements and to know for itself what the Government is doing.
>
> If FOIA is intended to allow the public to know what the Government is doing, to allow the Government to respond in some vague, categorical answer, or to say that it's not within the public's interest is to, in fact, subvert the entire intention of FOIA.
>
> And so for the Government to say that these records were obtained illegally doesn't satisfy the public's right to know what the records, in fact, are.

(Transcript of Oral Argument, Feb. 3, 1986, at 36–37.) That response merely assumes the answer: to say that "the interest of the public is the information in the records" is to assume that the public has a right to the

---

15. Plaintiff responded at oral argument to this example by arguing that Ellsberg's psychiatric file is exempt from FOIA disclosure by the privacy (or national security) exemptions to FOIA. (Transcript of Oral Argument, Feb. 3, 1985, at 38–39.) The privacy exemptions are the same exemptions claimed here by the government for not disclosing Infant Doe's medical records and,

plaintiff's wishes to the contrary, there is no principled distinction between Ellsberg's psychiatric records and Infant Doe's medical records. Apart from all that, however, the question of whether a FOIA exemption applies is not reached if the records at issue are not "agency records" within the meaning of FOIA.

records themselves, regardless of how they were obtained. But that precisely is the question: why should the public have access to documents illegally obtained solely because those documents are now in the possession, custody, and control of the agency? Does not the very act of disclosure to the public of documents which never would have been in the public domain but for the illegal act of government compound that illegality?

■ This Court holds that "agency records" do not include records obtained by a governmental agency without legal authority, express or implied, to do so. However, records which originate within the agency itself and which are generated by the agency, even during the course of an illegal investigation, are "agency records" within the scope of FOIA and are disclosable to the public unless a FOIA exemption applies. Of course, portions of government-generated reports that divulge information obtained from illegally acquired reports could not be disclosed because such disclosure would circumvent the rationale for not disclosing the illegally acquired reports themselves. Under this analysis, therefore, documents 1, 2, and 3 are not "agency records" and are non-disclosable under FOIA, but portions of the draft investigative report, document 4, are subject to disclosure, although a FOIA exemption may nonetheless preclude disclosure.

This Court hesitates, however, to rest its analysis on this holding alone for two reasons. First, as noted above, this is an issue of first impression; it is an issue which is not adequately informed by FOIA's legislative history; and it is an issue which, despite the Court's request, has not been thoroughly and adequately briefed and argued by the parties. Second, the government has raised the interesting twist that, in this case, the government believed in good faith that it was authorized by the Rehabilitation Act of 1973 to conduct the Infant Doe investigation, and the Supreme Court may yet rule that the government did have such authority. The government apparently argues that when the government believes in good faith that it was

authorized by statute to conduct an investigation and to obtain documents, those documents should be considered "agency records" within the scope of FOIA. This Court is not convinced that the government's good faith belief should make any difference except that such a belief obviously would affect the reason for non-disclosure claimed in the *Vaughn* index. Here, the government claimed specific FOIA exemptions as reasons for nondisclosure and continues to argue the applicability of those exemptions forcefully in its briefs in this Court. Accordingly, the Court will analyze each of those claimed exemptions in the context of an alternative holding in this case.

## I. *Exemption 7(A)*

Exemption 7(A) of FOIA protects "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would ... interfere with enforcement proceedings...." 5 U.S.C. § 552(b)(7)(A). The government contends that the medical records of Infant Doe, the roster of the Child Protection Team, and the report of the MCDPW to the Circuit Court of Monroe County, Indiana are all investigatory records of this nature.

■ "Investigatory records" are records compiled as part of an inquiry into specific suspected violations of the law, not records generated pursuant to "routine administration, surveillance or oversight of Federal programs." *Goldschmidt v. United States Department of Agriculture,* 557 F.Supp. 274, 276 (D.D.C.1983); *see also Center for National Policy Review on Race and Urban Issues v. Weinberger,* 502 F.2d 370, 373 (D.C.Cir.1974); *Gregory v. Federal Deposit Insurance Corp.,* 470 F.Supp. 1329, 1333–34 (D.D.C.1979), *rev'd on other grounds,* 631 F.2d 896 (D.C.Cir.1980).

Assuming that OCR is responsible for investigating possible discrimination against the handicapped in violation of Section 504 of the Rehabilitation Act of 1973— an assumption which the Second Circuit

has held to be invalid and which is currently being considered by the Supreme Court—the government argues that documents 1–3 satisfy the threshold test of Exemption 7(A): i.e., that they are each law enforcement investigatory records whose release would interfere with enforcement proceedings. Production of these records would interfere with enforcement proceedings by discouraging the prompt cooperation of institutions that is crucial for investigating the withholding of medical care from handicapped infants. "Infant-Doe-type" investigations require immediate OCR access to sensitive and confidential records under especially difficult circumstances. To meet that need, OCR depends on the voluntary cooperation of hospitals and institutions maintaining the relevant records; the price of that cooperation has been OCR's guarantee that the records obtained will remain confidential to the extent allowed by law.

Voluntary cooperation is crucial to those investigations because OCR has no power to subpoena records.[16] Consequently, OCR's regulations guarantee the confidentiality of records it obtains, especially medical records:

> Information of a confidential nature obtained in connection with compliance[,] evaluation or enforcement shall not be disclosed except where necessary in formal enforcement proceedings or where otherwise required by law.

45 C.F.R. § 80.6(c). According to the government, this guarantee was especially crucial in this case because of the intense publicity it received. OCR needed the cooperation of the local child protection agency, the MCDPW, which was itself a target of the investigation. The government concludes that ordering release of these records would undermine OCR's ability to obtain necessary records in such investigations in the future, especially where a threat to life mandates rapid investigation.[17]

Plaintiff in essence accepts the government's factual contentions as to the necessity for quick, voluntary compliance and as to the adverse effect disclosure of confidential medical records and other documents would have on future Infant Doe investigations and enforcement proceedings. Plaintiff contends, however, that the protection of Exemption 7(A) is limited to records whose disclosure would interfere with a pending enforcement proceeding involving those records and not to its effect on future proceedings. In support of this contention, plaintiff relies heavily on the legislative history of the 1974 amendments to FOIA and on the subsequent case law, particularly the Supreme Court's decision in *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). In that case, the records at issue were statements of "witnesses whose prior statements would, under the [NLRB]'s own rules, be disclosed to [the plaintiff] following the witnesses' [unfair labor practice] hearing testimony." *Robbins Tire, supra,* 437 U.S. 214, 218, 98 S.Ct. 2311, 2315, 57

---

**16.** Although the regulations implementing Section 504 mandate that recipients of HHS funds grant OCR access to their records (see 45 C.F.R. §§ 80.6, 84.61), enforcing this mandate is difficult. If an institution refuses to supply records voluntarily, OCR's only viable recourse is the cumbersome process of referring the matter to the Justice Department and asking that department to sue, seeking an injunction to permit access to records. *See* 45 C.F.R. §§ 80.8(a). The length of time this procedure may entail is shown by the only case in which the United States has had to use it. In that case, although HHS, the Justice Department, the defendant, and the court proceeded quite expeditiously, 26 days expired from the denial of access to a decision of the district court. *United States v.*

*University Hospital State University of New York at Stony Brook,* 575 F.Supp. 607, (E.D.N.Y.1983), *aff'd on other grounds,* 729 F.2d 144 (2d Cir. 1984). In cases where the baby is alive and the alleged denial of care is life-threatening, the government asserts that the delay entailed by this procedure could be critical.

**17.** This effort is currently suspended because of an injunction in *American Hospital Ass'n v. Heckler,* 83 Civ. 2638 (S.D.N.Y. June 11, 1984). No injunction was in effect while OCR investigated the Bloomington incident, and the government asserts that any future investigation of this sort will be undertaken only if and when legal authority to do so is restored.

L.Ed.2d 159 (1978). The Court held that such statements were exempt from disclosure under Exemption 7(A) prior to the unfair labor practice hearing and that the NLRB need not make a particularized showing in each case that disclosure of particular witness' statements would interfere with pending enforcement proceedings.

■ Although language exists in the Court's opinion and in the legislative history both to support the plaintiff's argument that Exemption 7(A) is unavailable if no enforcement proceeding involving the documents in question is pending or contemplated and to support the government's contrary position,[18] this Court finds the government's contention that Exemption 7(A) applies when the government can demonstrate specific and substantial harm to future enforcement proceedings to be more reasonable for several reasons.

First, the Court agrees with the government that:

> Not only does *Robbins Tire* lack any holding restricting Exemption 7(A) to interference with pending proceedings, but the logic of the decision actually *supports* applying the exemption to future interference. There were several bases for the Supreme Court's holding that Exemption 7(A) covers witness statements in NLRB proceedings. While some focused on harms that would result in the instant, pending, proceeding, another basis for the holding was that the NLRB had to give the limited assurance of confidentiality in order to induce witnesses

to cooperate. *Id.* [437 U.S.] at 240–41 [98 S.Ct. at 2325–26]. This part of the rationale is directed primarily at future cases—if the NLRB violates the assurances, it will have a chilling effect on witnesses in future cases.

(Defendants' Reply Brief at 9–10; emphasis in original; footnotes omitted.) Although plaintiff had several opportunities to respond to this contention both in the briefs and during oral argument, he did not do so except to argue that the only "chilling effect" at stake in *Robbins* was to the NLRB's pending case—an unfair labor practice hearing. (Plaintiff's Memorandum in Response to Defendants' Second Supplemental Memorandum Regarding the Applicability of *Van Bourg, Allen, Weinberg & Roger v. NLRB,* 751 F.2d 982 (9th Cir.1985) at 8–9.) But the Supreme Court's concerns about a possible chilling effect extended far beyond the pending unfair labor practice proceeding at issue, as the following language from the Court's opinion demonstrates:

> Since the vast majority of the Board's unfair labor practice proceedings are resolved short of hearing, without any need to disclose witness statements, those currently giving statements to Board investigators can have some assurance that in most instances their statements will not be made public (at least until after the investigation and any adjudication is complete). The possibility that a FOIA-induced change in the Board's prehearing discovery rules will

**18.** Case law subsequent to *Robbins Tire* also supports both positions. Some cases squarely hold that Exemption 7(A) is not intended to protect against interference with future enforcement proceedings. *Van Bourg, Allen, Weinberg & Roger v. N.L.R.B.,* 751 F.2d 982, 985 (9th Cir.1985); *Associated Dry Goods Corp. v. N.L.R.B.,* 455 F.Supp. 802, 812 (S.D.N.Y.1978). Others refer to interference with a "pending" proceeding but only in a context where the enforcement proceeding that would be affected by the disclosure was in fact pending. *See, e.g., Antonelli v. Drug Enforcement Administration,* 739 F.2d 302 (7th Cir.1984) (per curiam); *Peterzell v. Department of Justice,* 576 F.Supp. 1492 (D.D.C. 1983); *Bevis v. Department of State,* 575 F.Supp.

1253 (D.D.C.1983); *Freedberg v. Department of the Navy,* 581 F.Supp. 3 (D.D.C.1982). In yet other cases, the court's holding rests on the governmental agency's failure to show any actual harm to future enforcement proceedings. *See, e.g., Poss v. N.L.R.B.,* 565 F.2d 654 (10th Cir.1977). Finally, yet other cases squarely hold that Exemption 7(A) applies even to interference with future enforcement proceedings. *Timken Co. v. United States Customs Service,* 531 F.Supp. 194, 199–200 (D.D.C.1981); *Brinkerhoff v. Montoya,* 3 Gov't Discl.Serv. (P–H) ¶ 82,421 (N.D.Tex.1981). None of these cases engage in any in-depth analysis in reaching their holdings.

have a chilling effect on the Board's sources cannot be ignored.

437 U.S. at 241, 98 S.Ct. at 2326.

Second, plaintiff does not provide any basis for prohibiting disclosure while enforcement proceedings are pending or contemplated, but suddenly allowing disclosure once those proceedings have been concluded or are no longer contemplated, even though a cognizable harm to other enforcement proceedings is likely to occur. This case itself illustrates perfectly that such bright line demarcations between "pending" or "contemplated" and "future" enforcement proceedings are not easily drawn: the government has not been able to give this Court an unequivocal answer as to whether enforcement proceedings in this Infant Doe incident will ever be brought.[19]

More importantly, it is precisely these types of "wooden and mechanical" approaches to the interpretation of Exemption 7(A) that the 1974 amendments to FOIA were designed to prevent. *Robbins Tire, supra*, 437 U.S. at 230, 98 S.Ct. at 2321. If, as plaintiff concedes,[20] the government can demonstrate that disclosure of records will interfere with future enforcement proceedings, that interference is precisely the harm that Exemption 7(A) was designed to protect against. Indeed, the language of the Exemption refers to interference with "enforcement proceedings" in the plural, not to interference with the particular "enforcement proceeding" (in the singular) in question. This Court holds that Exemption 7(A) is broad enough to prohibit disclosure of law enforcement investigatory records whose release would interfere with enforcement proceedings,

pending, contemplated, or in the future, so long as the governmental agency can demonstrate concrete, cognizable, and substantial interference with such proceedings.

In the 1974 amendments to Exemption 7, Congress rejected the rationales of four decisions of the District of Columbia Circuit Court of Appeals: *Center for National Policy Review on Race and Urban Issues v. Weinberger*, 502 F.2d 370 (D.C.Cir. 1974); *Ditlow v. Brinegar*, 494 F.2d 1073 (D.C.Cir.1974) (per curiam), *cert. denied*, 419 U.S. 974, 95 S.Ct. 238, 42 L.Ed.2d 188 (1974); *Aspin v. Department of Defense*, 491 F.2d 24 (D.C.Cir.1973); and *Weisberg v. U.S. Department of Justice*, 489 F.2d 1195 (D.C.Cir.1973) (en banc), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). Those cases had construed the prior language of Exemption 7 literally, holding exempt any document in "investigatory files compiled for law enforcement purposes" regardless of whether release would cause any harm. It is crucial to note that this Court's holding today is not heralding a return to the pre-1974 Exemption 7 FOIA decisions rejected by Congress because this Court's holding is limited to permitting nondisclosure only where the government has met its burden of demonstrating that concrete, cognizable, and substantial interference will result to future enforcement proceedings if the documents are disclosed. That burden is significant and most probably must be decided on a case-by-case basis. Thus, by this ruling this Court by no means intends to grant the government blanket authority to withhold whole categories of documents under Exemption 7(A) on an unsubstantiated as-

---

**19.** Plaintiff contends that no such proceedings will ever take place because the MCDPW has voluntarily complied with all statutory and regulatory requirements.

**20.** Plaintiff states:
Whether the "failure to preserve the confidentiality of these records will make it much more difficult to obtain information in future investigations," as asserted by the Government, is *not* a material fact, as shown in Plaintiff's brief. In any case, it is disputed.

(Plaintiff's Statement Of Material Issues Of Facts As To Which There Is No Genuine Issue, ¶ 13.) Despite this assertion, plaintiff has produced no evidence to contest the government's evidence that disclosure would indeed impede future investigations, and plaintiff has made no attempt even to argue this point in his briefs. Accordingly, this Court must deem plaintiff to have conceded that disclosure will interfere with future OCR enforcement proceedings.

sertion of interference with future proceedings.

■ In this case, the government has amply demonstrated such a concrete, cognizable, and substantial interference with future OCR enforcement proceedings. It has submitted affidavits which establish: that OCR acquires patient medical records in Section 504 investigation only by assuring hospitals that the records will be maintained in confidence; that OCR's ability to enforce Section 504 would be diminished seriously if hospitals could not rely upon OCR's promise of confidentiality because OCR is forced to release the records pursuant to a FOIA request; that, particularly when an infant could die by the time that OCR and a hospital resolve a fight over OCR's entitlement to medical records, the hospital's voluntary and rapid cooperation for release of records gained through commitments of confidentiality is essential to the success of OCR's mandate; and that OCR's ability to obtain cooperation from state child protective service agencies would be seriously compromised if OCR were forced to release records in this case in direct contravention of the order of the Indiana Supreme Court placing the records under seal. (Dotson Declaration, ¶¶ 24–30.) Because the plaintiff has produced no evidence to contest the government's assertions of such interference with future Infant Doe investigations, should they resume after the Supreme Court's decision in *American Hospital Ass'n v. Heckler*, this Court rules that the government properly withheld disclosure of documents 1–3 under Exemption 7(A). Accordingly, summary judgment is granted in favor of the government on documents 1–3.

The government concedes, however, that if the Supreme Court affirms the Second Circuit completely, then its Exemption 7(A) claims will disappear because no future Infant Doe investigations of the type conducted here will occur and no future enforcement proceedings will result. Thus, the Court will proceed to analyze the remaining exemptions claimed by the government.

## II. *Exemptions 6 and 7(C)*

The government asserts that the medical records of Infant Doe, document 1, and the roster of members of the Child Protection Team, document 3, are exempt from disclosure under Exemptions 6 and 7(C). Exemption 6 protects records "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects law enforcement records to the extent that disclosure would "constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Both exemptions require the court to balance the asserted privacy interests at stake against any public interest in disclosure. Exemption 6 is "a balancing of the individual's right to privacy against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'" *Department of the Air Force v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976). The Seventh Circuit has applied this same test to Exemption 7(C). *Miller v. Bell*, 661 F.2d 623, 629 (7th Cir.1981) (per curiam), *cert. denied*, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 484 (1982). Although Exemption 7(C) is slightly broader on its face than Exemption 6 in that Exemption 7(C) protects against "unwarranted invasions" of personal privacy whereas Exemption 6 protects against "clearly unwarranted invasions," *Federal Bureau of Investigation v. Abramson*, 456 U.S. 615, 629–30 n. 13, 102 S.Ct. 2054, 2063 n. 13, 72 L.Ed.2d 376 (1982); *Miller v. Bell*, 661 F.2d at 629 n. 4, the distinction between the two exemptions results only in not requiring the balance in Exemption 7(C) to be tilted "emphatically in favor of disclosure" for the records to be exempt, *Bast v. United States Department of Justice*, 665 F.2d 1251, 1254 (D.C. Cir.1981). In other words, "the deletion of 'clearly' renders the Government's burden somewhat lighter" under Exemption 7(C). *1975 Source Book, supra* note 3, at 519.

### A. *Medical Records*

The government contends that under either balancing test, the privacy interests

here in the medical records of Infant Doe clearly outweigh any public interest in the disclosure of those records. The government contends that the family of Infant Doe has a substantial privacy interest in the medical records, the disclosure of which would cause a still greater privacy invasion, even though most of the central facts regarding Infant Doe's birth, treatment, and death are already public. To allow the public access to the intimate details of the medical records is to permit the public to "lift one of the veils separating the general public from a private family tragedy." (Defendants' Brief at 18.) Particularly because of the great degree of media news coverage of this Infant Doe incident, disclosure of the detailed medical records "would only be used as fodder for exploitation, such as by reproduction of the baby's footprints or by broadcast of the hospital staff's minute-by-minute impressions and views on the baby's condition and appearance and on the parents' emotions."[21] (Defendants' Brief at 18.)

The government also disagrees with plaintiff that any privacy interest may be adequately protected by deleting names and similar identifiers. The government argues first that in the context of this case, identification is irrelevant because this incident and others like it can be expected to remain the subject of such emotionally charged controversy that some have used terms such as "child abuse," "infanticide," and "murder" to describe it. Public disclosure of the medical records would, at the very least, reopen the painful experience for the family members and would constitute a needless assault on the family's privacy regardless of whether anyone ever knew the identity of this Infant Doe family.

Even more compelling is the fact that deletion of the family name and other obvious identifiers would not avoid the privacy invasion because a significant number of people already know the Does' identity: "the circumstances of the case make it extremely probable that many friends, co-workers, neighbors, and relatives, even if not told directly, would have deduced the identity of the family." (Defendants' Brief at 22.)

Finally, the government contends that releasing the medical records would not serve the public interest in knowing what it is that the government is doing because the medical records themselves give no information of OCR's investigative and enforcement actions. Those actions have already been made public in the final draft of the Investigative Report and its appendices. That report includes the nature of Infant Doe's medical condition, the medical opinions of the various doctors, the decisions made on care, the court proceedings, and the conduct of both Bloomington Hospital and the MCDPW. The government concludes:

> The infant's footprints, the progress notes by doctors and nurses, the characterizations of discussions among doctors and nurses, descriptions of the parents' emotional states, the educational and financial information about the parents, and similar information are all entirely irrelevant to OCR's compliance action. Disclosing them would in no way help the public monitor OCR's actions; nor would it serve any other public interest. The privacy invasion entailed by such a release is clearly unwarranted.

(Defendants' Brief at 23.)

Plaintiff responds first by arguing that Infant Doe has no right of privacy recog-

---

**21.** Pursuant to 5 U.S.C. § 552(a)(4)(B), this Court exercised its power to view the documents *in camera,* and, after having done so, cannot disagree with the government that this type of intimate information is contained therein.

On August 2, 1985, plaintiff moved to allow his attorney and a medical doctor to view the records submitted by the government for the Court's *in camera* inspection upon certain conditions. That motion is denied because this Court agrees with the government that such a procedure is both unprecedented and unneces-

sary. Plaintiff's request involves disclosure of the very information that this case is designed to obtain. Furthermore, the government's submissions, to which plaintiff has had full access, are sufficient to resolve the legal issues in this case. *See Arieff v. United States Department of the Navy,* 712 F.2d 1462, 1469 (D.C.Cir.1983) (Exemption 6); *Campbell v. Department of Health and Human Services,* 682 F.2d 256, 265 (D.C.Cir.1982) (Exemption 7(A)); *Public Citizen Health Research Group v. Department of Labor,* 591 F.2d 808 (D.C.Cir.1978) (Exemption 6).

nized by law because the infant has died.[22] Second, plaintiff cites Dean Prosser's exposition on the common law right of privacy as encompassing four invasions:

"1) Appropriation, for the defendant's advantage, of the plaintiff's name or likeness,

2) Intrusion upon the plaintiff's seclusion or solitude, or into his private affairs,

3) Publicity which places the plaintiff in a false light in the public eye, and

4) Public disclosure of embarrassing private facts about the plaintiff."

Prosser, *Privacy*, 48 Cal.L.Rev. 383, 389 (1960); Prosser, *Law of Torts* § 117 at 804–14 (4th ed. 1971). Of these, plaintiff contends that only the last—public disclosure of embarassing private facts about the plaintiff—applies, but argues that if the identity of the person is not revealed, there is no invasion of privacy.[23] Because plaintiff has requested that all identifying information be redacted, plaintiff concludes that there is no invasion of privacy. Third, plaintiff argues that the common law right of privacy is "a personal one which does not extend to the members of a family unless ... their own privacy is invaded along with his." Prosser, *Law of Torts* § 117 at 814–15. Plaintiff submits that courts have either rejected outright this "relational right of privacy," *see, e.g.,*

*James v. Screen Gems, Inc.*, 174 Cal. App.2d 650, 344 P.2d 799, 801 (Cal.App. 1959); or courts have held that to prevail, the plaintiff himself must be publicized to a substantial degree, *see e.g., Cordell v. Detective Publications, Inc.*, 307 F.Supp. 1212, 1220 (E.D.Tenn.1968), *aff'd*, 419 F.2d 989 (6th Cir.1969); or courts have held that the names or likenesses of the plaintiff's relatives must be publicized, *see, e.g., Mahaffey v. Official Detective Stories, Inc.*, 210 F.Supp. 251, 1253 (W.D.La.1952). Fourth, plaintiff argues that the Does have waived any right of privacy they might have by thrusting themselves into an issue of great public importance. Plaintiff contends that courts have recognized that a publication which deals with a matter of great public interest, even if it invades a person's privacy, is not subject to the tort of invasion of privacy.[24] Because the Does have, albeit inadvertently and unwillingly, thrust themselves into a matter of great public importance, they are public figures who have waived their right of privacy. Finally, plaintiff argues that no constitutional right of privacy encompasses the decision of parents to exercise autonomy to withhold treatment from their child in a life threatening situation solely because the child has Down's syndrome, citing numerous cases in which courts have intervened to order life-sustaining medical treatment for newborns with Down's syndrome.[25]

**22.** Plaintiff cites a slew of cases for this proposition, including *Maritote v. Desilu Productions*, 345 F.2d 418, 419 (7th Cir.1965); *Cordell v. Detective Publications, Inc.*, 419 F.2d 989, 990–91 (6th Cir.1969); *Melvin v. Reid*, 112 Cal.App. 285, 297 P. 91–93 (1931); *Wyatt v. Hall's Portrait Studio*, 128 N.Y.S. 247, 249–50, 71 Misc. 199 (1911); Prosser, *Law of Torts* § 112. *See also, Silets v. Federal Bureau of Investigation*, 591 F.Supp. 490, 498 (N.D.Ill.1984) (citing *Diamond v. Federal Bureau of Investigation*, 707 F.2d 75, 77 (2d Cir.1983), *cert. denied*, 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984); *Providence Journal*, 460 F.Supp. at 793 n. 53.

**23.** Plaintiff cites the following authorities for this proposition: *Branson v. Fawcett Publications, Inc.*, 124 F.Supp. 429, 432–33 (E.D.Ill. 1954); *Levey v. Warner Bros. Pictures, Inc.*, 57 F.Supp. 40, 42 (S.D.N.Y.1944); *Sellers v. Henry*, 329 S.W.2d 214, 215–16 (Ky.Ct.App.1959); *Waters v. Fleetwood*, 212 Ga. 161, 91 S.E.2d 344, 348 (1956); Note, *Privacy in Personal Medical*

*Information: A Diagnosis*, 33 U.Fla.L.Rev. 394, 404 n. 72 (1981).

**24.** For this proposition, plaintiff cites *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 888 (Ky.1981), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982); *Beresky v. Teschner*, 64 Ill.App.3d 848, 381 N.E.2d 979, 984 (2d Dist.1978); *Bradley v. Cowles, Magazine, Inc.*, 26 Ill.App.2d 331, 168 N.E.2d 64, 65 (1st Dist.1960); *Metter v. Los Angeles Examiner*, 35 Cal.App.2d 304, 95 P.2d 491, 494 (Cal.App.1939); and Note, 21 Rutgers L.Rev. at 90.

**25.** Plaintiff cites: *In re Guatrone*, (Bronx Fam. Div.1984) (imminent risk of death) (*Washington Post* May 25, 1984, A–19 col. 1); *In re Application of Cicero*, 101 Misc.2d 699, 421 N.Y.S.2d 965 (1979) (surgery ordered for infant born with spina bifida); *In re McNulty*, No. 9190

In response to the plaintiff's arguments, the government emphasizes that it is not relying on the privacy interest of the deceased Infant Doe, but of that of the Doe family.[26] The Doe family has a substantial privacy interest in not disclosing the medical records. That interest would not be protected adequately by deleting identifiers and is not outweighed by any public interest in disclosure. Plaintiff's objection to the "relational right of privacy" theory is irrelevant because the government does not rely on this theory, and, in any event, plaintiff has not demonstrated that the theory does not apply under FOIA. The government emphasizes that the medical records are just as much about Infant Doe's parents as they are about Infant Doe and thus the parents' privacy right is directly affected.

> Plaintiff's own briefs ... make clear that the public controversy over this incident consists largely of public debate over the morality and legality of the decision made by the parents. To say that the parents have no privacy rights in the records of an incident in which they are implicitly accused of infanticide is absurd.

(Defendants' Reply Brief at 15.)

The government identifies the parents' interest in being able to resume their lives without having the most intimate details of their tragedy replayed in the media as precisely the privacy right identified by the famous and often cited Warren and Brandeis article on privacy as the "right to be let alone." Warren & Brandeis, *The Right to Privacy*, 4 Harv.L.Rev. 193 (1890).

This Court agrees. Plaintiff's insistence that the privacy interest asserted here must be analyzed under the traditional common law privacy cases set forth by Professor Prosser or identified as a well-recognized and established constitutional privacy right is misplaced because it is overly rigid, formalistic, and inflexible. As the court stated in *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 n. 5 (3d Cir.1980):

> Privacy ... is control over knowledge about oneself. But it is not simply control over the quantity of information abroad; there are modulations in the quality of the knowledge as well. We may not mind that a person knows a general fact about us, and yet feel our privacy invaded if he knows the details. For instance, a casual acquaintance may comfortably know that I am sick, but it would violate my privacy if he knew the nature of the illness. Or a good friend may know what particular illness I am suffering from, but it would violate my privacy if he were actually to witness my suffering from some symptom which he must know is associated with the disease.

(*quoting* Fried, *Privacy*, 77 Yale L.J. 475, 483 (1968)). As in *Westinghouse Electric*, the privacy interest asserted here falls squarely within the privacy interest recognized by the Supreme Court in *Whalen v. Roe*, 429 U.S. 589, 599–600 n. 24, 97 S.Ct. 869, 876 n. 24, 51 L.Ed.2d 64 (1977): the right not to have an individual's private affairs made public by the government. *Westinghouse Electric*, 638 F.2d at 577.

(P.Ct. Essex Co. Mass.1978); *Maine Med. Center v. Houle,* No. 74–145 (Superior Ct. Cumberland Co., Me. Feb. 14, 1974) (court ordered treatment for infant born with multiple defects and a blockage of the esophagus); *Muhlenberg Hospital v. Patterson,* 128 N.J.Super. 498, 320 A.2d 518 (N.J.Super.Ct.Law Div.1974); *In re Teague,* No. 104–212–81886 (Cir.Ct. Baltimore, Md., filed Dec. 4, 1974) (child born with spina bifida); Brown and Truitt, *Euthanasia and the Right to Die,* 3 Ohio N.U.L.Rev. 615, 632 (1976) (unreported Detroit case in which the court ordered treatment for a Down's syndrome child with duodenal atresia); and *In re Obernauer* (Juv. and Dom.Rel.Ct., Morris Co. N.J. Dec. 22, 1970)

(court ordered treatment for Down's syndrome infant with duodenal atresia).

**26.** The Government asserts, however, that authority does exist to support the argument that the privacy interest protected by FOIA survives a person's death. *See Kiraly v. Federal Bureau of Investigation,* 728 F.2d 273, 277–78 (6th Cir. 1984). Some states even allow recovery in tort for the privacy invasions of dead persons. *See* 21 Okla.Stat.Ann. § 839.1 (1983); *Donahue v. Warner Bros. Pictures, Inc.,* 194 F.2d 6 (10th Cir.1952).

Although the ultimate contours of the right to privacy have yet to be defined, this case presents facts which lie at the heart of what any privacy right must mean. The Supreme Court has so far identified two elements of the right to privacy: the right to protect personal and privileged information from public scrutiny; and the right to make intimate family decisions free from governmental interference. *Whalen v. Roe*, 429 U.S. at 600, 97 S.Ct. at 876; *see also Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents ..."). The Supreme Court has acknowledged the fundamental right of familial privacy for over fifty years. *See e.g. Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Pierce v. The Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In *Prince, supra,* the Supreme Court recognized a private realm of family life that the state cannot enter without compelling justification. That compelling justification on occasion has been found where parents have refused to authorize routine medical care that would permit their child to lead a normal and healthy life. *E.g., Jehovah's Witnesses v. Kings County Hospital*, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968); *In re Sampson*, 29 N.Y.2d 900, 328 N.Y.S.2d 686, 278 N.E.2d 918 (1972). But the facts here, unfortunately, are tragically different.

This Court recognizes that serious issues concerning the propriety of the decision not to provide life-saving treatment to a Down's syndrome baby are associated with the facts of this case, but it is crucial to recognize as well that review of that decision is not before this Court. Although the

right to make intimate family decisions free from governmental interference is not at issue here, the right to protect personal and privileged information from public scrutiny is directly at stake. This Court feels a strong obligation to guard that right particularly because the parents of Infant Doe have not appeared in this case to assert their own interests. It is indeed ironic, and somewhat disturbing, that they have had to rely on the very governmental agency whose investigation led to their dilemma to protect their privacy interests in the matter.

■ From all that is present in the record in this case, it appears that the government has made no attempt to notify the Does so that they may assert their privacy interests personally. Although FOIA has no provision mandating notice to the person whose privacy interest is at stake, such a provision is contained within the Privacy Act, 5 U.S.C. § 552a. Under the Privacy Act, any disclosure of information covered by the Act is prohibited unless authorized by the prior written consent of the individual whose information is disclosed or unless authorized by one or more of the Act's specific exemptions, one of which is FOIA. 5 U.S.C. § 552a(b). However, the Privacy Act is applicable only to records maintained by an agency in such a way as to allow access to them by the individual's name or identifier. Here, the records at issue were not maintained by the Does' name or other identifier, and the consent provision of the Privacy Act apparently is not applicable.[27] Thus, so far as this Court is aware, the Does have not been informed to this day of the plaintiff's FOIA request for their infant's records and they have not appeared to assert their own rights.

**27.** The following exchange took place during oral argument on this issue:

THE COURT: Has the Government ever, to your knowledge, notified the Does under the provision of the Privacy Act so as to allow them to assert their private interests personally?

[The Government]: My understanding is that these records are not retrieved by the Does'

identity. They are not—I am not sure whether these records are part of a system of records, as that term is defined under the Privacy Act, or not. But in any case, they are not maintained under the Does' identifiers, so the Does would not be subject individuals for the purposes of the Privacy Act..

(Transcript of Oral Argument, Feb. 3, 1986, at 17.)

Moreover, although state common law doctrines of privacy may assist analysis, they are not dispositive in the FOIA context, which of course preempts state law. A separate body of privacy law has been developed under FOIA in which courts seldom look to the common law for more than an analytical framework. In the FOIA context, courts have held repeatedly that medical records are exempt from disclosure because "[t]he privacy interest in [medical records] is well recognized, even under the stringent standard of exemption 6." *Bast v. United States Department of Justice*, 665 F.2d 1251, 1254 (D.C.Cir.1981). *See also Florida Medical Ass'n v. Department of Health, Education & Welfare*, 479 F.Supp. 1291, 1303 (M.D.Fla.1979); ("For information that is purely and patently contained in personnel files and medical records, there is no question about the presumptive applicability of Exemption 6."); *Rural Housing Allowance v. United States Department of Agriculture*, 498 F.2d 73, 76 (D.C.Cir.1974) (U.S.D.A. investigative report of governmental housing discrimination in Florida which contained, *inter alia*, "intimate details" of medical condition, was within the ambit of Exemption 6.); *Plain Dealer Publishing Co. v. United States Department of Labor*, 471 F.Supp. 1023, 1028–30 (D.D.C.1979) (Disclosure of workers' compensation claim files containing medical information which would reveal the intimate details of a claimant's work-related injury or disability, his medical history, and a clinical psychologist's evaluation of the claimant held prohibited under Exemption 6 as a clearly unwarranted invasion of a personal privacy given minimal public interest to be advanced by disclosure.); *Columbia Packing Co. v. United States Department of Agriculture*, 417 F.Supp. 651 (D.Mass.1976), *aff'd*, 563 F.2d 495 (1st Cir.1977) (Disclosure of personnel files of two former agency employees containing medical records held prohibited by Exemption 6 because the privacy interest outweighed public interest.).

Plaintiff's argument that the Does are "public figures" who have "waived" their rights of privacy by having thrust themselves into a matter of public interest, albeit unwillingly, is similarly misplaced in the FOIA context. The very cases cited by plaintiff recognize that Exemptions 6 and 7(C) protect the privacy interests even of public figures, although the result of the balancing test may be affected. *See Providence Journal Co. v. Federal Bureau of Investigation*, 460 F.Supp. 778, 789–91 n. 52 (D.R.I.1978), *rev'd on other grounds*, 602 F.2d 1010 (1st Cir.1979), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980); *Congressional News·Syndicate v. United States Department of Justice*, 438 F.Supp. 538, 542 n. 2, 543 (D.D.C.1977). Privacy interests of public figures may be somewhat diminished in the balance, but they are not nullified under FOIA Exemptions 6 and 7(C).

In conducting that balance, this Court is convinced that the Does' privacy interests in the medical records clearly outweighs the minimal public interest in disclosure such that disclosure would constitute a "clearly unwarranted invasion of personal privacy" under Exemption 6.[28] The government does not dispute that a public interest exists in the Infant Doe matter both in the decision to withhold treatment knowing that the infant would die and in the oversight of OCR's enforcement of the civil rights laws. But the government correctly points out that the inquiry cannot end with that determination:

> Two critical inquiries remain. First, what is the nexus between the public debate on either of these issues and the particular records still withheld by OCR—would those records really contribute to this public debate? Second, how does any such contribution compare with the harm caused by the invasion of the family's privacy?

(Defendants' Reply Brief at 21.)

In examining these questions, the Court agrees with the government that plaintiff

---

**28.** *A fortiori* disclosure is also prohibited by the less stringent balance of Exemption 7(C).

has not demonstrated adequately that *any* issue in the public policy debate turns on any information available in the medical records but not already disclosed to the public or that any withheld medical record would contribute to the public's oversight of OCR's role in the matter. Plaintiff first attempts to demonstrate that disclosure would provide necessary information relevant to the policy/ethical issues by contending in conclusory terms that substantial inaccuracies as to the infant's medical condition have appeared in the published accounts of the incident. As the government points out, most of the bases for these claims are not in the record or are hearsay. Accordingly, they cannot be considered in these cross-motions for summary judgment.[29] Even if they could be considered, the general assertions contained in the affidavits submitted in support of plaintiff's motion for summary judgment that disclosure of these medical records could further the policy/ethical debate are not persuasive because they fail to identify how disclosure of the technical medical information would affect the debate, if at all. Similarly, plaintiff's argument that disclosing the records would assist public oversight of OCR's enforcement of the Rehabilitation Act of 1973 is not supported by specific facts or analysis. Plaintiff does not explain, and the Court does not understand, how medical charts are relevant to show what actions OCR or other federal agencies took to investigate this incident or others like it. The medical records simply do not demonstrate the reasoning process used by federal agencies in taking, or in not taking, any particular enforcement action.

Thus, plaintiff has failed to demonstrate what information in the medical records might contribute to the public debate on these issues; he has not identified any factual dispute regarding the baby's condition that is relevant to the public debate and the resolution of which depends on access to the medical records; and he has not specified what information would help the public assess the government's law enforcement activity. As the government succinctly concludes on this point:

Plaintiff's failure to identify the nexus between the medical records and the public debate, and his total failure to attempt to weigh the supposed benefit to the public against the invasion of the family's privacy, are fatal gaps in his case for disclosing the records. Those gaps compel a finding that the records are exempt under Exemption 7(C). But the gaps are even more telling—they lead one to conclude that plaintiff wants the records not because of what information they might contribute to the public debate, but purely for the dramatic impact to be anticipated from the mass reproduction of the baby's footprints or from the broadcasting of the hospital staff's minute-by-minute impressions and views on the baby's condition and appearance and on the parents' emotions. In other words, those gaps compel the conclusion that plaintiff wants these records for precisely the use that would cause the greatest pain to the family and most seriously invade their privacy.

(Defendants' Reply Brief at 23.)

Although this Court is well aware that the reasons for which a plaintiff makes a FOIA request ordinarily are not relevant to deciding whether the requested documents are exempt from disclosure, *see, e.g., Antonelli v. Drug Enforcement Administration,* 739 F.2d 302, 304 (7th Cir. 1984), such reasons properly may be taken into account in weighing the balance between the public interest and the privacy interests under Exemptions 6 and 7(C). Because plaintiff has not substantiated his claim that the medical records of Infant

29. For example, plaintiff's citations to legal commentary and other articles (Plaintiff's Brief at 5–6) to demonstrate inaccuracies in published accounts of the incident are not in the record in this case, and, without a proper foundation, are hearsay in any event. Nor does the plaintiff's reference to editorials from Indianapolis papers calling for the disclosure of medical records, contained in Plaintiff's Supplemental Appendix M, provide any factual basis for believing that those records will serve the public interest.

Doe will inform in any way the debate on the public interest issues or will contribute to the public's oversight function of OCR's role in this case, and because the privacy interests at stake are substantial—indeed, overwhelming—this Court holds that the medical records are exempt from disclosure under Exemptions 6 and 7(C). Accordingly, the defendants' motion for summary judgment is granted as to Infant Doe's medical records.

### B. *The Circuit Court Report and the Roster*

 The Circuit Court Report (document 2) is a two page report of the MCDPW Child Protection Team submitted to the Monroe County Circuit Court. It is in the form of a sworn statement of the director of the MCDPW, describes the hearing held by the Child Protection Team on April 12, 1982 to determine whether to appeal Judge Baker's ruling, and includes the names of the team members. Document 3 consists entirely of names and addresses [30] of the Child Protection Team members. The government contends that the roster in its entirety and the team members' names from document 2 are exempt under the privacy exemptions to FOIA, Exemptions 6 and 7(C), because the government asserts that the team's decision not to appeal the Circuit Court judgment refusing to order treatment for Infant Doe could possibly expose team members to harassment by persons disagreeing with that decision.

These records stand on a different footing than the medical records of Infant Doe because they do not contain the same type of intimate details of personal information. More importantly, plaintiff seeks the identities of public officials who made decisions affecting the public interest. Disclosure of this information goes to the heart of the basis for FOIA—the public's right to know how public officials are conducting the affairs of government and to hold public officials working in their official capacities accountable. Moreover, the government now

resorts to the same device plaintiff used with respect to Infant Doe's medical records: the government asserts only in conclusory terms that disclosure of the team members' identities "might possibly" subject them to harassment or annoyance and fails to provide any evidence to support this conclusion or even to define "harassment." As the court held in *Demetracopoulos v. Federal Bureau of Investigation*, 510 F.Supp. 529, 532 (D.D.C.1981), the "bare claim" that "disclosure of the identities of such officials could subject them to unofficial inquiries that could result in harassment or discomfort" is "insufficient under the law." This Court holds that documents 2 and 3 are not exempted by FOIA Exemptions 6 and 7(C) because the government has not met its burden of demonstrating that such harassment will occur.

### III. *Exemption 5*

The government contends that document 4, the draft version of the Investigative Report, is exempted under FOIA Exemption 5, which protects intra-agency memoranda that fall within a recognized evidentiary privilege. 5 U.S.C. § 552(b)(5); *see United States v. Weber Aircraft Corp.*, 465 U.S. 792, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984). The government asserts the privilege for predecisional deliberations within the government. This privilege has three underlying purposes: (1) to encourage frank and candid intra-governmental communications over policy alternatives; (2) to protect the public from premature exposure to policies before they are actually adopted; and (3) to protect the decision-making process by ensuring that officials and agencies are judged by what they finally decided and not by what options and factors they considered before making a decision. *Jordan v. United States Department of Justice*, 591 F.2d 753, 772–73 (D.C. Cir.1978) (en banc).

 Whether a document falls within the privilege depends on two factors:

---

**30.** Plaintiff agrees that the addresses may not be disclosed.

whether the document is "predecisional" —whether it was generated *before* the adoption of an agency policy—and whether the document is "deliberative"— whether it reflects the give-and-take of the consultative process.

*Coastal State Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980) (emphasis in original). Draft documents in particular are exempt under this privilege since they "reflect the personal opinions of the writer rather than the policy of the agency." *Id.* Where an employee writes a draft document and the agency uses a consultative process (*e.g.*, circulating the draft for comments, or having the draft reviewed up the supervisory or organization chain) to determine what the final versions will include, and where the final document is released, then the draft is exempt. *Russell v. Department of the Air Force*, 682 F.2d 1045, 1048–49 (D.C.Cir.1982); *Lead Industries Ass'n, Inc. v. Occupational Safety and Health Administration*, 610 F.2d 70, 86 (2d Cir.1979). The draft is predecisional in that it is written before the agency decides what the final version will include; it is deliberative because it is submitted to others as the author's input to the decision-making process.

The government describes the particular draft Investigative Report at issue here as follows:

It was written by an investigator in OCR's Regional Office in Chicago. He followed the essential format of OCR investigative reports. The draft represented his preliminary-stage recommendation as to what the final Investigative Report should say. It included his recommendations (none of which was binding on OCR), as to what facts were relevant, as to what OCR should find were the relative responsibilities of the various parties, and as to how the legal and factual positions of the hospital and the [MCDPW] might be stated. It also included his recommended conclusions (which were not binding on OCR) based on the preliminary evidence taken as a whole. He submitted the draft to OCR Headquarters in accord with a review

and clearance process adapted from the normal OCR procedure for Investigative Reports. After reviewing the draft, OCR headquarters staff decided to take additional investigative steps, which led to significant revisions in the draft report. They used the draft as the first step in framing and stating the issues and the facts. The draft has been superseded by the final report, which has been disclosed to plaintiff. The draft is therefore exempt.

(Defendants' Brief at 27–28; footnote omitted.)

Plaintiff does not dispute that the draft report qualifies as an Exemption 5 record. Instead, plaintiff cites the FOIA provision which requires that the government disclose segregable portions, 5 U.S.C. § 552(b)(5), and the cases in which courts have required the disclosure of substantive facts contained in the records which are not "inextricably intertwined" with the revelation of the deliberative process. *See, e.g., Environmental Protection Agency v. Mink*, 410 U.S. 73, 89–91, 93 S.Ct. 827, 836–37, 35 L.Ed.2d 119 (1973); *Paisley v. C.I.A.*, 712 F.2d 686, 698–99 (D.C.Cir.1983); *Playboy Enterprises, Inc. v. Department of Justice*, 677 F.2d 931, 935 (D.C.Cir.1982). To this point, the government responds by asserting that "even where a record is, on its surface, entirely factual, its role in the decisionmaking process may justify treating it as deliberative." (Defendants' Reply Br. at 28.) The government contends that the privilege was intended to protect not just deliberative material—i.e., opinions, comments, recommendations—but the deliberative *process*. For example, a summary of an extensive factual record prepared to assist the ultimate decisionmaker is exempt from disclosure even though the summary is entirely factual on its face because its release would reveal the decisionmaking process and thereby compromise it. *See, e.g., Playboy Enterprises, Inc. v. Department of Justice*, 677 F.2d 931, 935–36 (D.C. Cir.1982); *Lead Industries Ass'n. v. Occupational Safety and Health Administration*, 610 F.2d 70, 83–86 (2d Cir.1979);

*Montrose Chemical Corp. v. Train,* 491 F.2d 63 (D.C.Cir.1974).

After review of the draft Investigative Report *in camera,* this Court agrees with the government's assessment of the report as a draft by a subordinate agency official which was subsequently submitted through a comment and clearance process and substantially altered before the final Investigative Report, which already has been disclosed to plaintiff, was prepared. It contains a great deal of factual material, but it also contains significant excerpts from the medical records, which this Court has held exempt from disclosure. Substantial changes in the factual recitations in the draft report are evident in the final report, both in additions, deletions, and variations in emphasis and order. It further contains an entire section of conclusions. This Court finds that document 4 is entirely exempt as a draft submitted through a comment and clearance process. *See Russell v. Department of the Air Force,* 682 F.2d 1045, 1049–49 (D.C.Cir.1982).

## IV. *Subordinate Agency Officials*

As a final matter, this Court agrees with the government that defendants Sermier and Roberts, as subordinate agency officials, are improper party defendants who must be dismissed. Although this District has allowed actions against agency heads, *see, e.g., Miller v. Webster,* 483 F.Supp. 883, 886 (N.D.Ill. 1979), *modified on other grounds,* 661 F.2d 623 (7th Cir.1981), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 484 (1982); *Nemetz v. Department of the Treasury,* 446 F.Supp. 102, 106 (N.D.Ill.1978); *Hamlin v. Kelley,* 433 F.Supp. 180, 181 (N.D.Ill.1977), there is no basis for suing subordinate officials in either their individual or official capacities. Plaintiff's suggestion that FOIA's disciplinary provisions justify naming subordinate agency employees as parties defendant, *see* 5 U.S.C. § 552(a)(4)(F)-(G), has been rejected soundly by the most recent courts to have considered the question. *Gary Energy Corp. v. United States Department of Energy,*

89 F.R.D. 675, 677 (D.Col.1981); *Ostheimer v. Chumbley,* 498 F.Supp. 890, 891 (D.Mont.1980). Moreover, the distinction between agency heads and subordinate officials was explicitly approved by the court in *White v. United States,* 1980–2 U.S.Tax Cas. (CCH) ¶ 9540 (N.D.Ohio 1980). Accordingly, defendants Sermier and Roberts are dismissed from this case.

## *Conclusion*

For the reasons stated above, documents 1–3 may not be disclosed because they are not "agency records" within the meaning of FOIA if the Supreme Court affirms the Second Circuit's decision in *American Hospital Ass'n.* Alternatively, if that decision is not affirmed in pertinent part, then documents 1–3 are also exempt from disclosure under FOIA Exemption 7(A). Document 1, Infant Doe's medical records, is exempt as well under FOIA Exemptions 6 and 7(C). However, the names of the Child Protection Team Members found in documents 2 and 3, although exempt from disclosure pursuant to FOIA Exemption 7(A), are not exempt from disclosure under Exemptions 6 and 7(C). Document 4 is exempt from disclosure under FOIA Exemption 5. Defendants Sermier and Roberts are dismissed. Accordingly, the parties' cross-motions for summary judgment are granted in part and denied in part. It is so ordered.